**SO ORDERED.**

**SIGNED this 21 day of November, 2013.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| RICHARD H. MEIER<br>TERINA D. MEIER, | 13-02323-8-SWH |
| DEBTORS | |

**ORDER DENYING MOTION FOR TURNOVER**

This matter came before the court on the chapter 7 trustee's motion for turnover pursuant to 11 U.S.C. § 542(a), to which Richard H. Meier and Terina D. Meier ("the debtors") have objected. A hearing was held in Raleigh, North Carolina, on September 5, 2013. At the conclusion of the hearing, the court took the matter under advisement.

**BACKGROUND**

The female debtor, Terina Meier, is a member of the Pokagon Band of Potawatomi Indians ("the tribe"), based in Michigan. As a member of the tribe, she receives a monthly per capita share of gaming revenue generated by the tribe's casinos. The payments are made pursuant to the tribe's Revenue Allocation Plan ("RAP"), which governs the distribution of gaming revenue to eligible tribe members. The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, allows Indian tribes to operate gambling facilities and use the revenues thereby generated for a limited number of

purposes. 25 U.S.C. § 2710(b)(2)(B). One such purpose is "to provide for the general welfare of the Indian tribe and its members," id., which may be accomplished by per capita distributions of a portion of the gaming revenues to tribal members. 25 U.S.C. § 2710(b)(3). Such distributions must be regulated by the tribe's RAP, which is first created by the tribe and then approved by the Secretary of the Interior. Id.; 25 C.F.R. pt. 290; see generally Felix S. Cohen, Cohen's Handbook of Fed. Indian Law § 12.09 (2012).

The RAP created by the Pokagon Band recognizes per capita gaming distributions as a means of providing for the general welfare of the tribe. Ex. A to Debtors' Resp. to Chapter 7 Trustee's Mot. (Pokagon Band of Potawatomi Indians Gaming Revenue Allocation Plan) (hereinafter "Plan") at 1 Sec. 1. The Plan articulates the appropriate use of the per capita account from which distributions are made, as follows:

> The Per Capita Payment Account shall be used to advance the current and long-term personal health, safety and welfare of Band members by providing to members a periodic payment of money from net gaming revenues, pursuant to the standards and provisions of this Code. The Per Capita Account shall be used exclusively to make payments to eligible members.

Plan at 3 Sec. 3.D.2. Such payments "shall be in *equal amounts* and shall be given to *all* enrolled Band members." Id. at 3 Sec. 5 (emphasis added). The Plan provides further that "the amount of money available at the time [of distribution] in the Per Capita Account shall be divided by the number of eligible Band members at that time, and the result will be the amount of each member's payment." Id.

Only living members of the tribe are eligible to receive payments. "All living persons who are enrolled members of the Band shall be eligible for per capita payments as provided by the provisions of this Code. These persons shall be termed 'eligible members.'" Id. at 3 Sec. 6.A.

Upon a member's death, the payments cease, including those that the tribe has decided to distribute but has not yet mailed. "A Band member shall cease to be eligible for per capita payments upon his/her death, and if the Enrollment Clerk determines that a member has died before per capita payments have been mailed, no payment for a deceased member shall be made, either in the name of the member or to his/her estate or heirs." Id. at 4 Sec. 6.C.

The Plan stipulates that an "Enrollment Coordinator" determines Band members' eligibility for payment on November 30th of every year, and that "payments shall be made monthly . . . on specific dates as determined by the Tribal Council." Id. at 3, Secs. 4 and 6.B.1. Thus, the amount that is paid to an eligible member depends on several changeable factors, including the number of eligible band members (determined with reference to births and deaths), any disclaimer of payment by a member (permitted under Section D of the Plan), and most obviously on the net gaming revenues themselves, which depend on, and are reflective of, factors outside the scope of the Plan. The payments, accordingly, may "fluctuate from month to month." Id. at 3 Sec. 5.

Finally, the Plan also contains a "No Vested Rights" provision, which states:

> Nothing contained in this Code shall be construed to give any person a vested property right or interest in Band gaming revenues. All Band gaming revenues shall be held by the Band until disbursed pursuant to Band law and this Code. This Code may be amended only through referendum or initiative vote of the Band's membership, subject to applicable law.

Id. at 8 Sec. 16.

The debtors filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on April 10, 2013. In their bankruptcy schedules, the debtors listed per capita payments from the tribe

3

totaling $3,671 for 2011, $6,183 for 2012, and $2,000 for 2013, as of the date of the petition.[1] On April 12, 2013, David Warren was appointed as chapter 7 trustee to administer the estate. On July 8, 2013, the trustee filed a motion pursuant to 11 U.S.C. § 542(a) to compel turnover of the payments, arguing that both the 2013 payments and the debtor's right to receive future per capita payments constituted property of the estate. The debtors filed a response in opposition on July 24, 2013, contending that future per capita payments remain property of the tribe until distribution, that debtors have no property interest in them, and that any expectation the female debtor may have with respect to payment from the tribe did not come within the boundaries of estate property.

## DISCUSSION

Pursuant to § 542(a), a bankruptcy trustee has a right to turnover of property that he may use, sell, or lease under § 363, and any entity in possession, custody, or control of such property must turn it over to the estate, "unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). The trustee argues that the female debtor's expected future distributions from gaming revenue are property of the estate such that debtors must turn them over under § 542(a), while debtors maintain that the distributions are not estate property. That particular issue – whether the distributions constitute property of the estate – takes center stage in other gaming revenue cases, but in this case, in the context of the trustee's motion for turnover, the court need not, and does not, decide it. Instead, the court concludes that even supposing, without deciding, that the future payments were property of the estate, the payments are of "inconsequential value or benefit" to the estate. They are, for that reason, not subject to turnover under § 542(a).

---

[1] For convenience, the court from time to time refers to the debtors' arguments in a collective sense; the court notes, however, the per capita payments at issue are made specifically and only to Ms. Meier, and not to the debtors jointly.

**I.    Property of the Estate**

The "property of the estate" issue figures so prominently in other gaming revenue cases that the court will briefly discuss it here, though only to the extent that doing so is helpful in establishing the "big picture" of the issues involved in such cases. In their Statement of Financial Affairs, the debtors listed the per capita gaming payments as income but did not include them as personal property on their bankruptcy schedules, and did not claim an exemption therein.[2] A bankruptcy estate is created upon commencement of a bankruptcy case, and encompasses "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). Under § 541(a), the definition of 'property of the estate' "has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." Segal v. Rochelle, 382 U.S. 375, 379 (1966); In re Jenkins, 410 B.R. 182, 189-90 (Bankr. W.D. Va. 2008) (despite being decided under the Bankruptcy Act, rather than the Bankruptcy Code, the Segal test continues to apply in the Fourth Circuit). This broad definition includes both tangible and intangible property. United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05 (1983).

Although bankruptcy law controls what constitutes "property of the *estate*," the companion question of precisely what interest a debtor may have *in that property* is left to nonbankruptcy law. In re FCX, Inc., 853 F.2d 1149, 1153 (4th Cir. 1988). Generally, this means state law. Butner v. United States, 440 U.S. 48 (1979). The issue of tribal gaming distributions, however, involves a uniquely complicated mixture of state, federal, and tribal law, and a quick review of the cases

---

[2] Had they done so, a claimed exemption would have served as an admission that the asset was property of the estate. See Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 616 (9th Cir. 1988) (exempt property is initially regarded as property of the estate and the debtor may then remove it from the estate by claiming exemptions).

5

endeavoring to sort through them reveals that the confluence of those laws leads courts in widely differing directions. Some courts, for example, conclude that a debtor's expectation of future gaming payments does constitute a property right, which is properly included in the bankruptcy estate. See, e.g., In re Kedrowski, 284 B.R. 439 (Bankr. W.D. Wis. 2002) (right to receive gaming payments was a contingent property right under state (Wisconsin) law and thus part of the estate); In re Howley, 446 B.R. 506, 510 (Bankr. D. Kan. 2011) (following Kedrowski, and emphasizing that tribal law as articulated in the RAP at issue did not limit members' rights to compel payments and did not include a stipulation that the tribe retained all rights in the gaming monies until payments were disbursed); In re Hutchinson, 354 B.R. 523 (Bankr. D. Kan. 2006). Other courts find, for varying reasons, that gaming payments pursuant to a RAP do not constitute part of the estate. See, e.g., In re Barth, 485 B.R. 919, 922 (Bankr. Minn. 2013) (holding that tribal law determines an individual's interest in per capita payments and that such payments were not part of estate where the tribal ordinance contained an anti-alienation clause stating that payments were a personal benefit to community members and explicitly declaring the payments not to be a property right); In re Fess, 408 B.R. 793, 799 (Bankr. W.D. Wis. 2009) (holding that "a federal interest, namely the Ho-Chunk Nation's interest in creating and defining property interests in per capita distributions, outweighs Wisconsin's interest in uniformity of definition of property interests"); Ho-Cak Fed. v. Herrell (In re DeCora), 396 B.R. 222, 225 (W.D. Wis. 2008) (concluding that a tribe's right "to distribute its own assets as it sees fit is central to self-governance").

Whether per capita gaming payments are property of the estate under § 541(a) is, obviously, a hotly debated question. In the instant case, the court is not required to decide it. The trustee's turnover motion presents a question that is both more narrowly focused and dispositive: specifically,

whether the debtor's expectation of future gaming payments is precluded from turnover on grounds that it is of inconsequential value or benefit to the estate.

## II.     Inconsequential Value to Estate

Section 542(a) states that any entity in possession, custody, or control of property of the estate must turn it over to the estate "unless such property is of inconsequential value or benefit to the estate," and at least one other court has focused on this "inconsequential value or benefit" qualifier in the context of a trustee's efforts to seek turnover of tribal gaming payments. In In re Brown, the Bankruptcy Appellate Panel for the Ninth Circuit affirmed the bankruptcy court's finding that the per capita gaming distributions at issue were property of the estate, but vacated and remanded the bankruptcy court's ruling against the debtor's abandonment motion under § 544(a), wherein the debtors had argued that the property was of inconsequential value to the estate. Brown v. Locke (In re Brown), 2006 WL 6810938 *15-16 (9th Cir. B.A.P. 2006). The appellate court concluded that the bankruptcy court abused its discretion when it ruled "without analyzing and making findings and conclusions concerning whether there was any value or benefit to the estate in the stream of future Payments." Id. at *16.

An "interest in future distributions is only of value to the estate if it can be assigned, sold or reached for the enforcement of judgments," the Brown court held. And to determine whether the debtor's interest in per capita payments satisfied that standard, the court looked to the language of the RAP, or "ordinance," before it:

> Per capita distributions of profits from tribal enterprises are a discretionary choice of the tribal government, and therefore, we look to the language of the Ordinance to determine whether Trustee may take control of future Payments for the estate's benefit, and whether there are any restrictions imposed upon that interest. . . . Furthermore, the Supreme Court has admonished courts to interpret Indian treaties

7

>and applicable federal statues by resolving any doubtful expressions in favor of the Indians' sovereignty.

Id. at *12 (internal citations omitted).

The court concluded that while the ordinance did not prohibit assignment, neither did the ordinance allow it. Much like the Plan in this case, the ordinance in Brown provided that "the per capita shares did not become [the debtor's] personal property until each Payment date." Id. at *14. Thus, the Brown court concluded, the debtor's "contingent interest in future Payments, while intangible property of the estate, may or may not be protected against transfer to third parties." Id. (concluding further that "[t]his matter was neither addressed by the bankruptcy court nor satisfactorily analyzed in either Johnson or Kedrowski").

This court believes that the issue highlighted in Brown is of central importance, and that the rationale articulated in that case is applicable in this one as well. As discussed earlier, the Plan provides that the debtor has no "vested property right or interest" in the gaming revenues, which are held as property of the Band "until disbursed." Plan at 8 Sec. 16. The Plan makes no allowances for transferability within the tribe,[3] and its protocols are inconsistent with transferability to outside

---

[3] Once the decision to make per capita distributions is made, each living, eligible member of the tribe is entitled to an equal share of the payments. Id. at 3 Sec. 5. The requirement that payments be equal applies regardless of how much the payments vary from month to month or year to year. The exclusivity and nontransferability is evidenced further by the Plan provision prohibiting a member's heirs from receiving the member's payments after the member dies. Id. at 4 Sec. 6.C. The Plan also stipulates that payments are to be made to individual members in very specific ways intended to reach that member, and only that member; *i.e.*, "by check sent by U.S. mail to the eligible member's current address or by direct deposit to the member's designated bank account." Id. at 5 Sec. 7.A. Members may not "pick up" their checks, and payments that cannot be delivered in accordance with the Plan and are not claimed by the member within a 12-month period are forfeited to the per capita fund. Id. at 5 Sec. 7.B.

8

third parties.[4]  It appears to the court that these gaming payments are far removed from the sort of property that typically comes within the ambit of § 542.  See, e.g., In re Charter Co., 913 F.2d 1575, 1579 (11th Cir. Fla. 1990) (holding that Congress intended § 542 "to apply to tangible property and money due to the debtor without dispute which are fully matured and payable on demand") (internal citations omitted).

The very premise of the Plan, which declares as its purpose that "the Per Capita Account shall be used exclusively to make payments to eligible members," indicates the tribe's clear intent to preclude sale or transfer of the right to receive payments to anyone outside of the tribe.  Id. at 3 Sec. 3.D.2.  To countenance such transfers would frustrate the tribe's purpose of using the per capita payments to provide for "personal health, safety, and welfare of Band members."  Id.  On this note, it is worth pointing out that in a liquidation bankruptcy, if the court were to allow turnover, the debtor would lose her right to future payments upon satisfaction of the debt.  These per capita payments are both inconsistent and relatively modest on an annualized basis, but considered cumulatively, over the course of the debtor's lifespan, they may ultimately total to a substantial sum.  The permanent loss of this income stream and abandonment of the sums payable after satisfaction of the debt would dramatically impede not only the debtor's capacity to make the "fresh start" envisioned by the Bankruptcy Code, but also to maintain her standard of living for decades to come.  See Brown, 2006 WL 6810938 *2-3 (discussing these policy considerations).  The court finds these points very telling, but does not now attempt the careful and detailed analysis of sovereignty law and

---

[4] The only exceptions in the Plan pertain to certain trusts that may be established for minors or legally incompetent members; for child support obligations as evidenced by order of a state or tribal court; and for garnishment, if ordered by the Tribal Council "[u]pon enactment of an appropriate Code."  Id. at 5-8.

public policy issues that a full discussion of them would require.  Instead, the court simply observes that pursuant to the Plan, the per capita payments the debtor expects to receive appear to be non-transferable, and as such are of negligible value to the estate.

In addition, other factors also limit the potential marketability and value of the per capita payments: most obviously, the variability of the casino's income from year to year, as well as provisions in the Plan stipulating that upon the death of an eligible member, payments cease immediately.  Id. at 4 Sec. 6.C.  The court is uncertain how the trustee would endeavour to market and sell the debtor's future expectation of payments in light of these unresolvable variables, given that candid disclosure of them would send most sensible "buyers" running in the other direction.  Moreover, even assuming that future gaming payments to the debtor reached (on an annual basis) the 2012 high of approximately $6,000, the chapter 7 estate would need to remain open for at least eight more years in order to satisfy the debtors' $48,000 of unsecured debt.  The court is persuaded that even if the gaming payments were to be considered property of the estate, their value to it is inconsequential.  The trustee's efforts to administer the payments in this case would, in fact, be a detriment to, and a burden on, the estate.

## CONCLUSION

The court having concluded that the debtors' expectancy of future payments is of inconsequential value to the estate under § 542(a), the trustee's motion for turnover is **DENIED.**

**SO ORDERED**.

### END OF DOCUMENT